1

2

3

4                                  UNITED STATES DISTRICT COURT

5                              NORTHERN DISTRICT OF CALIFORNIA

6

7    LORENZO ADAMSON,                        Case No.   13-cv-05233-DMR
                    Plaintiff,
8
         v.
9                                            **ORDER ON DEFENDANTS' MOTION
                                             FOR SUMMARY JUDGMENT**
10   CITY OF SAN FRANCISCO, et al.,
                                             Re: Dkt. No. 59
     Defendants.
11

12         Plaintiff Lorenzo Adamson filed this civil rights action under 42 U.S.C. § 1983 and state

13   law claiming that he suffered injuries during a May 2013 traffic stop.  He asserts claims against

14   the City of San Francisco ("the City"), San Francisco Police Chief Greg Suhr, and San Francisco

15   Police Department ("SFPD") Officers Christopher O'Brien, Daniel Dudley, and Brian Stansbury

16   (collectively, the "Defendant Officers").  Defendants now move for summary judgment.  [Docket

17   No. 59.]  The court conducted a hearing on September 10, 2015.  For the following reasons,

18   Defendants' motion is GRANTED IN PART AND DENIED IN PART.

19                                           **I. Background**

20   **A.      Factual Background[1]**

21         Adamson is an African American SFPD officer who was on disability leave at the time of

22   the incident.  On the evening of May 30, 2013, Adamson was driving alone through the Bayview

23   District in San Francisco.  O'Brien and Dudley, SFPD recruits in their field training phase, were

24   on patrol with Stansbury, their Field Training Officer.  O'Brien and Dudley observed that

25   Adamson's car lacked front and back license plates and decided to conduct a traffic stop.  Since

26   the car did not have visible plates, the Defendant Officers were unable to run the license plate

27   _____

28   [1] The parties did not submit a joint statement of undisputed facts.  In recounting the statement of
     facts, the court will indicate any factual disputes.

*United States District Court*
*Northern District of California*

United States District Court
Northern District of California

number through the computer to learn any information about the car, such as whether it was

stolen.  Dudley, who was driving, activated the lights and siren.  Adamson quickly pulled over and

turned off the car.  The Defendant Officers pulled in behind Adamson's car, and O'Brien and

Stansbury got out.  As O'Brien approached the back passenger side of Adamson's car, Adamson

rolled down the back passenger window or windows, which were tinted, to allow O'Brien to see

into the car.

O'Brien said, "oh, you're alone, right?," which Adamson confirmed.  Adamson Dep. at

173-74.  O'Brien then stated, "you don't have a plate on your car," to which Adamson replied "I

know." *Id.* at 174.  O'Brien then asked Adamson "[a]re you on parole or probation?" *Id.*  In

response, Adamson asked, "[w]hat does that have to do with [the traffic stop]?"  O'Brien repeated

his statement that the car did not have any plates. *Id.* at 175.  Adamson asked O'Brien, "Officer,

what does me not having a plate on my car have to do with me being on parole or probation?

[S]houldn't you be asking me for my license, registration, and proof of insurance?" *Id.* at 175,

176.  According to Adamson, O'Brien responded, "that's how we do out here." *Id.* at 176.

O'Brien then stated, "[i]f you don't answer my question, I'm going to take you out of the car." *Id.*

at 176-77.  At some point during this exchange, Adamson took the keys out of the ignition at

O'Brien's direction and placed them on the passenger seat.

Adamson did not respond to O'Brien's question.  O'Brien looked over the top of the car

and told Dudley, who was standing at the driver's side, to take Adamson out of his car.  Dudley

opened the door and Adamson got out.  Dudley then asked him to move to the rear of the car.

Once he was there, the officers ordered Adamson to sit on the curb.  Adamson told the officers, "I

can't do that, I'm on DP[2] for a low back injury," at which point O'Brien grabbed Adamson's wrist

and ordered him to sit down.  Adamson Dep. at 189.  Adamson then said, "You know what, before

this get[s] out of hand, I'm a cop and I work at Bayview Station," simultaneously lifting his shirt

up "so they could see [his] credentials" at his waist, i.e., his police badge and firearm in a holster.

*Id.* at 194.  Adamson, who has "a real strong voice," testified that he made this statement "out

---

[2] At his deposition, O'Brien confirmed that  "DP" is "common vernacular around the police
department" for "being out on disability." (O'Brien Dep. at 82.)

2

1    loud." *Id.*

2        Stansbury saw the gun, a black semiautomatic, and testified that he did not notice a badge

3    next to Adamson's holster.  Stansbury yelled "221," which is police code for "person with a gun."

4    He then grabbed Adamson's gun out of the holster and threw it on the hood of the car behind him,

5    approximately one foot away.  Dudley and O'Brien immediately "jumped" Adamson, each

6    grabbing one leg "to try to lift [Adamson] up in the air so they could slam [him] to the ground."

7    Adamson Dep. at 196, 198.  Adamson testified that he "couldn't let them do that" to him, so he

8    latched onto the lumber rack of the pickup truck parked at the curb and held on.  *Id.* at 199.

9    During the altercation, Adamson kept repeating, "I'm a cop, I'm a cop."  Witnesses standing

10   across the street were also yelling, "he's a cop, he's a cop."  *Id.*  Each of the Defendant Officers

11   heard Adamson yell "I'm a cop."  O'Brien and Stansbury testified that they did not know whether

12   to believe him.

13       Dudley and O'Brien were unable to get Adamson to let go of the truck and eventually let

14   his legs down.  Stansbury then came up behind Adamson and put his arms around his neck,

15   attempting a carotid restraint.  Adamson released the lumber rack and fell back on top of

16   Stansbury on the sidewalk with Stansbury's arms around his neck.  Adamson, who ended up on

17   his stomach with his hands by his side and Stansbury on his back, said "[h]urry up and cuff me

18   because I can't breathe."  Adamson Dep. at 229.  Once Adamson had been handcuffed, Stansbury

19   released his arms from his neck.  Shortly thereafter, backup officers arrived and identified

20   Adamson as a fellow SFPD officer.  The officers helped Adamson to his feet, removed his

21   handcuffs, and handed him his firearm.  Adamson then walked to talk to the witnesses across the

22   street and later traveled to the hospital in an ambulance.

23   **B.     Procedural History**

24       Adamson filed his complaint on November 12, 2013.  [Docket No. 40.]  He alleges the

25   following causes of action: 1) section 1983 claim for unreasonable seizure, use of excessive force,

26   and violations of due process and equal protection; 2) section 1983 claim for municipal liability;

27   3) violation of California's Ralph Act, California Civil Code section 51.7; 4) violation of

28   California's Bane Act, California Civil Code section 52.1; 5) assault and battery; 6) intentional

United States District Court
Northern District of California

3

1   infliction of emotional distress; and 7) negligence.  Adamson brings all but the second claim

2   against the Defendant Officers.  Adamson brings his second claim, for municipal liability pursuant

3   to *Monell v. Department of Social Services of City of New York*, 436 U.S. 658 (1978), against the

4   City and Chief Suhr.

**II. Legal Standards**

6   A court shall grant summary judgment "if . . . there is no genuine dispute as to any material

7   fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The burden

8   of establishing the absence of a genuine issue of material fact lies with the moving party, *see*

9   *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986), and the court must view the evidence in the

10  light most favorable to the non-movant.  *See Scott v. Harris*, 550 U.S. 372, 378 (2007) (citation

11  omitted).  A genuine factual issue exists if, taking into account the burdens of production and

12  proof that would be required at trial, sufficient evidence favors the non-movant such that a

13  reasonable jury could return a verdict in that party's favor.  *Anderson v. Libby Lobby, Inc.*, 477

14  U.S. 242, 248.  The court may not weigh the evidence, assess the credibility of witnesses, or

15  resolve issues of fact.  *See id.* at 249.

16  To defeat summary judgment once the moving party has met its burden, the nonmoving

17  party may not simply rely on the pleadings, but must produce significant probative evidence, by

18  affidavit or as otherwise provided by Federal Rule of Civil Procedure 56, supporting the claim that

19  a genuine issue of material fact exists.  *TW Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809

20  F.2d 626, 630 (9th Cir. 1987) (citations omitted).  In other words, there must exist more than "a

21  scintilla of evidence" to support the non-moving party's claims, *Anderson*, 477 U.S. at 252;

22  conclusory assertions will not suffice.  *See Thornhill Publ'g Co. v. GTE Corp.*, 594 F.2d 730, 738

23  (9th Cir. 1979).  Similarly, "[w]hen opposing parties tell two different stories, one of which is

24  blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not

25  adopt that version of the facts" when ruling on the motion.  *Scott*, 550 U.S. at 380.

**III. Analysis**

27  **A.      Fourteenth Amendment Claims**

28  Adamson's section 1983 claim is based on four individual violations: 1) unreasonable

United States District Court
Northern District of California

4

United States District Court
Northern District of California

1    seizure, based on the Fourth and Fourteenth Amendments; 2) deprivation of life or liberty without

2    due process, based on the Fourteenth Amendment; 3) excessive force, based on the Fourth and

3    Fourteenth Amendments; and 4) violation of equal protection, pursuant to the Fourteenth

4    Amendment.  Compl. ¶ 29.

5    　　　　Defendants did not move for summary judgment on Adamson's due process and equal

6    protection claims.  However, at the hearing, Adamson essentially conceded the former.  For this

7    reason, the court dismisses the due process claim with prejudice, but does not consider Adamson's

8    equal protection claim at this time.

9    　　　　Defendants also did not move for summary judgment on the unreasonable seizure and

10   excessive force claims based on the Fourteenth Amendment.  However, "if a constitutional claim

11   is covered by a specific constitutional provision . . . the claim must be analyzed under the standard

12   appropriate to that specific provision, not under the rubric of substantive due process."  *Cty. of*

13   *Sacramento v. Lewis*, 523 U.S. 833, 843 (1998).  Claims for unreasonable seizures and excessive

14   force fall within the Fourth Amendment.  *Terry v. Ohio*, 392 U.S. 1, 9 (1968); *Graham v. Connor*,

15   490 U.S. 386, 395 (1989).  Therefore, to the extent Adamson's unreasonable seizure and excessive

16   force claims are based on the Fourteenth Amendment, they are dismissed with prejudice.

17   **B.    1983 Claims against Defendant Officers**

18   　　　　**1.    Unlawful Detention**

19   　　　　Defendants move for summary judgment on Adamson's claim that he was unlawfully

20   detained.  They argue that ordering Adamson out of his car and directing him to sit on the curb

21   during the traffic stop was reasonable as a matter of law.

22   　　　　"The Fourth Amendment prohibits 'unreasonable searches and seizures' by the

23   Government."  *United States v. Arvizu*, 534 U.S. 266, 273 (2002) (citing *Terry*, 392 U.S. 1, 9

24   (1968)).  In *Terry*, the Supreme Court elaborated a three-tier structure of Fourth Amendment

25   jurisprudence.  *See United States v. Erwin,* 803 F.2d 1505, 1508 (9th Cir. 1986) (summarizing

26   *Terry*).  "The first tier consists of those law enforcement activities, such as police questioning

27   conducted pursuant to valid consent, that do not constitute searches or seizures governed by the

28   Fourth Amendment."  *Id.*  "The second tier consists of limited intrusions such as pat-downs of the

United States District Court
Northern District of California

1    outer clothing (or 'frisks') and brief investigative detentions.  To justify these 'limited' searches

2    and seizures, law enforcement officials must possess a reasonable, articulable suspicion that the

3    suspect has recently committed a crime or is about to commit one." *Id.*  "The third tier comprises

4    'full scale' searches or arrests requiring probable cause." *Id.*; *Kraus v. Pierce Cty.*, 793 F.2d 1105,

5    1108 (9th Cir. 1986) ("Where more than a limited intrusion occurs, an arrest occurs and probable

6    cause is required.").

7            "[T]he Fourth Amendment requires only reasonable suspicion in the context of

8    investigative traffic stops." *United States v. Lopez-Soto*, 205 F.3d 1101, 1105 (9th Cir. 2000); *see

9    also Rodriguez v. United States*, 135 S. Ct. 1609, 1614 (2015) ("a routine traffic stop is 'more

10   analogous to a so-called '*Terry* stop' . . . than to a formal arrest.'" (quoting *Knowles v. Iowa*, 525

11   U.S. 113, 117 (1998))).  "Like a *Terry* stop, the tolerable duration of police inquiries in the traffic-

12   stop context is determined by the seizure's 'mission'—to address the traffic violation that

13   warranted the stop, and attend to related safety concerns." *Rodriguez*, 135 S. Ct. at 1614 (citations

14   omitted).  Therefore, "[b]ecause addressing the infraction is the purpose of the stop, it may 'last no

15   longer than is necessary to effectuate th[at] purpose." *Id.* (second alteration in original) (quoting

16   *Florida v. Royer*, 460 U.S. 491, 500 (1983)).

17           Here, Adamson does not argue that the length of the traffic stop was excessive.  Instead, he

18   argues that "any probable cause [for the traffic stop] was vitiated by the Defendant Officers'

19   retaliatory conduct."  Pl.'s Opp'n 11.  Specifically, Adamson asserts that O'Brien violated City

20   policy and protocol by asking Adamson whether he was on parole or probation during a traffic

21   stop.  O'Brien then retaliated against Adamson by making him exit the car and sit on the curb

22   because he had challenged O'Brien's questions.  Adamson also argues that his removal from the

23   car was improper because it exceeded the scope of the traffic stop.

24           Adamson's arguments are unpersuasive.  First, "in a traffic-stop setting, the first *Terry*

25   condition—a lawful investigatory stop—is met whenever it is lawful for police to detain an

26   automobile and its occupants pending inquiry into a vehicular violation." *Arizona v. Johnson*, 555

27   U.S. 323, 327 (2009).  Adamson admits that his car lacked license plates, thereby conceding the

28   lawfulness of the traffic stop.  Therefore, *Gasho v. United States*, 39 F.3d 1420, 1438 (9th Cir.

1      1994), cited by Adamson, is distinguishable.  In *Gasho*, the Ninth Circuit denied qualified

2      immunity in connection with an arrest by customs agents that was not supported by probable

3      cause, noting that "[p]robable cause is obviously lacking when the arrest is motivated purely by a

4      desire to retaliate against a person who verbally challenges the authority to effect a seizure or

5      arrest." *Id.*  Here, it is undisputed that Adamson's detention—the traffic stop—was supported by

6      reasonable suspicion; i.e., because Adamson's car lacked plates.  Therefore, Adamson's detention

7      was not "motivated purely" by retaliation for challenging O'Brien.

8             Second, Adamson provides no support for his argument that the reasonable suspicion

9      supporting the traffic stop somehow ended when O'Brien ordered him out of the car.  Indeed, the

10     Supreme Court has held otherwise.  "[O]nce a motor vehicle has been lawfully detained for a

11     traffic violation, the police officers may order the driver to get out of the vehicle without violating

12     the Fourth Amendment[]."  *Pennsylvania v. Mimms*, 434 U.S. 106, 111 n.6 (1977) (per curiam)

13            Adamson also offers no support for his assertion that O'Brien asked an improper question.

14     There is no record evidence that the question about parole or probationary status violated any

15     SFPD policy or protocol, and O'Brien testified that he was trained to make that inquiry during

16     traffic stops.  Moreover, "[a] seizure for a traffic violation justifies a police investigation of that

17     violation." *Rodriguez*, 135 S. Ct. at 1614-15.  Adamson disputes the necessity of O'Brien's

18     question, arguing that asking for his license or registration "would have been proper investigation

19     of the traffic infraction" at issue.  Pl.'s Opp'n 12.  In response, Defendants assert that the question

20     was appropriate, since O'Brien "sought important information regarding the as-yet unidentified

21     driver of a vehicle who appeared to be hiding his identity by driving an unlicensed car with tinted

22     windows." Defs.' Reply 2.  However, the court need not decide whether O'Brien's question was

23     necessary or related to his investigation of Adamson's infraction, because "mere police

24     questioning does not constitute a seizure." *See Muehler v. Mena*, 544 U.S. 93, 101 (2005)

25     (quoting *Florida v. Bostick*, 501 U.S. 429, 434 (1991)) (holding that officers detaining plaintiff

26     during execution of a search warrant lawfully questioned her about her immigration status where

27     the questioning did not prolong the detention).  Further, the Supreme Court has "made plain" that

28     "inquiries into matters unrelated to the justification for the traffic stop . . . do not convert the

United States District Court
Northern District of California

7

United States District Court
Northern District of California

1    encounter into something other than a lawful seizure, so long as those inquiries do not measurably

2    extend the duration of the stop." *Johnson*, 555 U.S. at 333 (citation omitted).  "[O]rdinary

3    inquiries incident to [the traffic] stop . . . involve checking the driver's license, determining

4    whether there are outstanding warrants against the driver, and inspecting the automobile's

5    registration and proof of insurance." *Rodriguez*, 135 S. Ct. at 1615 (citations omitted) (holding

6    that a dog sniff conducted after completion of a traffic stop "is not an ordinary incident of a traffic

7    stop . . . [and] is not fairly characterized as part of the officer's traffic mission").  Since Adamson

8    offers no evidence that O'Brien's question about his parole or probation status unreasonably

9    prolonged the stop, the court finds that "there was no additional seizure within the meaning of the

10   Fourth Amendment." *See Muehler*, 544 U.S. at 101.

11          Since it is undisputed that the Adamson's traffic stop was supported by reasonable

12   suspicion, the court grants summary judgment on Adamson's unlawful detention claim.

13          **2.      Excessive Force**

14          The Defendant Officers move for summary judgment on Adamson's excessive force claim

15   on the grounds that each of them used reasonable force as a matter of law.  In the alternative, they

16   argue that they are entitled to qualified immunity.

17                  **a.      Reasonableness of the Defendant Officers' Use of Force**

18          A claim of excessive force in the context of an arrest or investigatory stop implicates the

19   Fourth Amendment right to be free from "unreasonable . . . seizures."  U.S. Const. amend. IV; *see*

20   *Graham*, 490 U.S. at 394.  "Determining whether the force used to effect a particular seizure is

21   reasonable under the Fourth Amendment requires a careful balancing of the nature and quality of

22   the intrusion on the individual's Fourth Amendment interests against the countervailing

23   governmental interests at stake." *Id.* at 396 (citations and internal quotation marks omitted).

24   Because the reasonableness standard is not capable of precise definition or mechanical application,

25   "its proper application requires careful attention to the facts and circumstances of each particular

26   case, including the severity of the crime at issue, whether the suspect poses an immediate threat to

27   the safety of the officers or others, and whether he is actively resisting arrest or attempting to

28   evade arrest by flight." *Id*.  The "most important single element" is whether there is an immediate

8

1   threat to safety. *Smith v. City of Hemet*, 394 F.3d 689, 702 (9th Cir. 2005) (en banc) (quoting

2   *Chew v. Gates*, 27 F.3d 1432, 1441 (9th Cir. 1994)). Courts also consider the "'quantum of force'

3   used to arrest the plaintiff, the availability of alternative methods of capturing or detaining the

4   suspect, and the plaintiff's mental and emotional state." *Luchtel v. Hagemann*, 623 F.3d 975, 980

5   (9th Cir. 2010) (internal citations omitted).

6         The reasonableness inquiry in excessive force cases is an objective one: whether the

7   officer's actions are objectively reasonable in light of the facts and circumstances confronting him,

8   without regard to his underlying intent or motivation and without the "20/20 vision of hindsight."

9   *Graham*, 490 U.S. at 396. "Force is excessive when it is greater than reasonable under the

10  circumstances," *Santos v. Gates*, 287 F.3d 846, 854 (9th Cir. 2002), and "the reasonableness of

11  force used is ordinarily a question of fact for the jury." *Liston v. Cty. of Riverside*, 120 F.3d 965,

12  976 n.10 (9th Cir. 1997). "Because the excessive force inquiry nearly always requires a jury to sift

13  through disputed factual contentions, and to draw inferences therefrom, [the Ninth Circuit has]

14  held on many occasions that summary judgment or judgment as a matter of law in excessive force

15  cases should be granted sparingly." *Avina v. United States*, 681 F.3d 1127, 1130 (9th Cir. 2012)

16  (internal quotations and citations omitted); *Santos*, 287 F.3d at 853 ("police misconduct cases

17  almost always turn on a jury's credibility determinations.").

18        The Defendant Officers argue that they are entitled to summary judgment on Adamson's

19  excessive force claim because their actions were objectively reasonable as a matter of law. They

20  contend that they only used force once they became aware that Adamson was armed with a gun,

21  and he was reaching toward it with his hand. According to Defendants, this created a deadly and

22  immediate threat. Defendant Officers further assert that after Adamson was disarmed, he resisted

23  attempts to be taken into custody, thereby justifying additional applications of force, including a

24  carotid restraint.

25        With respect to the argument that the initial use of force was justified because Adamson

26  had a gun and it was close to his hand, the Ninth Circuit has cautioned that while "there is no

27  question" that an individual's possession of a weapon "is an important consideration, it . . . is not

28  dispositive. Rather, courts must consider 'the totality of the facts and circumstances in the

United States District Court
Northern District of California

9

particular case'; otherwise, that a person was armed would always end the inquiry." *Glenn v. Washington Cty.*, 673 F.3d 864, 872 (9th Cir. 2011) (citation omitted).  Here, Adamson did not simply display his weapon to the Defendant Officers.  Instead, as he lifted his shirt to show the Defendant Officers his police badge and firearm, he said, "You know what, before this get[s] out of hand, I'm a cop and I work at Bayview Station."  Adamson Dep. at 194.  This provided a clear, unequivocal explanation for why Adamson was armed.  What the Defendant Officers saw or heard is unclear.  Stansbury denied seeing Adamson's badge next to his holster, but O'Brien and Dudley are silent on this point.  Defendants do not address whether any of the Defendant Officers heard Adamson's initial statement that he worked at Bayview Station, let alone dispute that fact.[3]  A statement that an officer fears for his or her safety or the safety of others must be supported by "objective factors to justify such a concern."  *Young v. Cty. of Los Angeles*, 655 F.3d 1156, 1163 (9th Cir. 2011).  In this case, a jury will have to decide whether safety concerns justified the application of force.  This is because viewing the evidence in the light most favorable to Adamson, and drawing all inferences in his favor, a reasonable jury could conclude that Adamson's statement, "I'm a cop and I work at Bayview Station" undermined any perceived threat, especially since Adamson simultaneously showed his badge and his weapon, and had done nothing up to that point to suggest that he posed a physical danger.[4]  Defendants argue that Adamson's statement "did nothing to reduce the perceived level of threat," because "[a]nyone can attempt to gain a

---

[3] There is no record evidence about whether any of the Defendant Officers heard Plaintiff's initial statement that he worked at Bayview Station.  Stansbury's testimony on this point is unclear.  He testified that when he heard Plaintiff say "I'm a cop," he "didn't know how to interpret that" and "found it strange," (Stansbury Dep. at 132-33), but it is not clear if he was testifying about Plaintiff's first statement that he worked at Bayview Station or his subsequent yelling "I'm a cop, I'm a cop" after the officers were attempting to restrain him.  Similarly, Dudley testified that he heard Plaintiff "yelling generally" that he was a cop, but it appears Dudley was testifying about Plaintiff's actions *after* he was released from handcuffs, not before the officers moved to restrain him. (Dudley Dep. at 94 ("He was kind of yelling generally at no one in particular. Q. Okay. Did he still seem upset? A. Yes.").)  Finally, although O'Brien testified that he heard Plaintiff saying "I'm a cop" multiple times, he stated that he heard this statement after O'Brien started "bear hugging" Plaintiff to restrict his access to his firearm.  (O'Brien Dep. at 83.)

[4] A reasonable jury could also decide that Plaintiff's use of police lingo moments before, telling the officers that he was on "DP," put the officers on notice that he may be affiliated with SFPD.  At least one officer admitted that DP was common police parlance for being out on disability leave.

1    surprise advantage by claiming law enforcement status while reaching for a gun." Defs.' Mot. 8.

2    Notably, none of the Defendant Officers state that they actually discounted Adamson's statement

3    for this reason. But even if there were such evidence in the record, Defendants would be asking

4    the court to make a credibility determination, which is impermissible on summary judgment. In

5    other words, whether the Defendant Officers credibly and reasonably believed that Adamson

6    posed an immediate threat presents a genuine question of material fact that must be resolved by a

7    jury. *See Young*, 655 F.3d at 1163-64.

8         A reasonable jury could also conclude that the Defendant Officers were not justified in

9    using force on Adamson, because he had been pulled over for a simple traffic violation, and did

10   not engage in any dangerous behavior. In determining "whether there is a sufficiently strong

11   governmental interest to justify a given use of force," the court must consider "the severity of the

12   crime at issue." *Id*. at 1164. Adamson committed one offense prior to the Defendant Officers' use

13   of force: driving his car without license plates. The Ninth Circuit has held that "[t]raffic violations

14   generally will not support the use of a significant level of force," *Bryan v. MacPherson*, 630 F.3d

15   805, 828 (9th Cir. 2010), and Defendants cite no authority that Adamson's traffic violation was

16   "severe" within the meaning of the *Graham* analysis. Finally, Defendants do not argue that

17   Adamson was "actively resisting arrest or attempting to evade arrest by flight" at the moment the

18   officers tried to take him to the ground. *See Graham*, 490 U.S. at 396. Although Adamson did

19   not answer O'Brien's question about his parole or probation status and objected to the order to sit

20   on the curb, a reasonable jury could find that Adamson was reasonably compliant with the

21   Defendant Officers up until the point they used force. A reasonable juror could also question

22   whether Stansbury's use of a carotid hold amounted to excessive force. It is undisputed that

23   Stansbury applied the hold after disarming Adamson. Although the record indicates that Adamson

24   resisted being taken to the ground, there is no evidence that Adamson tried to fight back or injure

25   the Defendant Officers.

26        In sum, the court is unable to conclude that the Defendant Officers' use of force was

27   objectively reasonable in light of the circumstances confronting them as a matter of law. Viewing

28   the evidence in the light most favorable to Adamson, and drawing all inferences in Adamson's

United States District Court
Northern District of California

11

1    favor, the court finds that a reasonable jury could conclude that each officer's use of force toward

2    Adamson was not reasonable.  Accordingly, summary judgment as to Adamson's excessive force

3    claim against the Defendant Officers is denied.

b.    **Qualified Immunity**

5         The Defendant Officers also move for summary judgment on the grounds that they are

6    entitled to qualified immunity.  The doctrine of qualified immunity protects government officials

7    "from liability for civil damages insofar as their conduct does not violate clearly established

8    statutory or constitutional rights of which a reasonable person would have known."  *Harlow v.*

9    *Fitzgerald*, 457 U.S. 800, 818 (1982).  The analysis involves two inquiries.  First, taken in the

10   light most favorable to plaintiff, the court must ask whether the facts alleged show that the

11   officer's conduct violated a constitutional right.  *Saucier v. Katz*, 533 U.S. 194, 201 (2001).  If the

12   answer is "no," then the court need not inquire further before ruling that the officer is entitled to

13   qualified immunity.  *Id.*  If, however, "a violation could be made out on a favorable view of the

14   parties' submissions," the court must examine "whether the [constitutional] right was clearly

15   established."[1]  *Id.*  "The relevant, dispositive inquiry in determining whether a right is clearly

16   established is whether it would be clear to a reasonable officer that his conduct was unlawful in

17   the situation he confronted."  *Brosseau v. Haugen*, 543 U.S. 194, 198-99 (2004) (citing *Saucier*,

18   533 U.S. at 202).  If the law did not put the officer on notice that his conduct would be clearly

19   unlawful, summary judgment based on qualified immunity is appropriate.  *Saucier*, 533 U.S. at

20   202.

21        As discussed above, taken in the light most favorable to Adamson, a reasonable jury could

22   conclude that Adamson posed little or no threat to the Defendant Officers, was not suspected of

23   having committed a serious crime, and was not resisting the officers when they used force on him,

24   and accordingly could find that their use of force was not justified under the circumstances.  It has

25   long been established that "[f]orce is excessive when it is greater than reasonable under the

26

27   [1] In *Pearson v. Callahan*, 555 U.S. 223, 236 (2009), the Supreme Court held that a court has the discretion to decide "which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand."

28

United States District Court
Northern District of California

1    circumstances," *Santos*, 287 F.3d at 854, and that "where there is no need for force, *any* force used

2    is constitutionally unreasonable." *Fontana v. Haskin*, 262 F.3d 871, 880 (9th Cir. 2001).

3    Therefore, the Defendant Officers are not entitled to qualified immunity.

4    **C.    *Monell* Claim**

5            A municipality may face section 1983 liability if it "'subjects' a person to a deprivation of

6    rights or 'causes' a person 'to be subjected' to such deprivation." *Connick v. Thompson*, ---U.S.---

7    ,---, 131 S. Ct. 1350, 1359 (2011) (quoting *Monell*, 436 U.S. at 692).  However, the municipality

8    may be held liable "only for '[its] *own* illegal acts.'" *Id.* (quoting *Pembaur v. Cincinnati*, 475 U.S.

9    469, 479 (1986)).  It cannot be held vicariously liable for its employees' actions. *Id.* (citations

10   omitted).  To establish municipal liability, plaintiffs "must prove that 'action pursuant to official

11   municipal policy' caused their injury." *Id.* (quoting *Monell*, 436 U.S. at 691).  "The 'official

12   policy' requirement 'was intended to distinguish acts of the *municipality* from acts of *employees*

13   of the municipality,' and thereby make clear that municipal liability is limited to action for which

14   the municipality is actually responsible." *Pembaur*, 475 U.S. at 479-80 (emphasis in original).

15   Official municipal policy includes "the decisions of a government's lawmakers, the acts of its

16   policymaking officials, and practices so persistent and widespread as to practically have the force

17   of law." *Connick*, 131 S. Ct. at 1359 (citations omitted).  Such policy or practice must be a

18   "moving force behind a violation of constitutional rights." *Dougherty v. City of Covina*, 654 F.3d

19   892, 900 (9th Cir. 2011) (citing *Monell*, 436 U.S. at 694).

20           "A single constitutional deprivation ordinarily is insufficient to establish a longstanding

21   practice or custom." *Christie v. Iopa*, 176 F.3d 1231, 1235 (9th Cir. 1999).  However, an isolated

22   constitutional violation may be sufficient to establish a municipal policy in the following three

23   situations: 1) "when the person causing the violation has 'final policymaking authority,'" *see id*. at

24   1235; 2) when "the final policymaker 'ratified' a subordinate's actions," *see id*. at 1238; and 3)

25   when "the final policymaker acted with deliberate indifference to the subordinate's constitutional

26   violations." *See id*. at 1240.

27           The basis for Adamson's *Monell* claim is not clear.  Adamson appears to contend that the

28   City ratified the Defendant Officers' unlawful conduct, which consisted of both O'Brien's asking

United States District Court
Northern District of California

1   the "improper" question about Adamson's probation or parole status and the Defendant Officers'

2   "retaliatory" conduct in ordering Adamson out of the car and assaulting him.  (Pl.'s Opp'n 17-18.)

3   As discussed above, there is no evidence that O'Brien's question actually violated City policy, and

4   the order that Adamson exit his car was not unlawful.  More fundamentally, Adamson offers no

5   evidence to support his claim that the City "ratified" the conduct by failing to discipline the

6   Defendant Officers.  "To show ratification, a plaintiff must prove that the 'authorized

7   policymakers approve a subordinate's decision and the basis for it.'"  *Christie*, 176 F. 3d at 1239

8   (quoting *City of St. Louis v. Paprotnik*, 485 U.S. 112, 127 (1988)).  In the absence of any evidence

9   that the City or Chief Suhr knew of or reviewed the Defendant Officers' actions, Adamson has

10   failed to establish a triable issue of fact as to ratification.

11   **D.      California Civil Code section 51.7 (Ralph Act)**

12          California Civil Code section 51.7, the Ralph Act, provides that "[a]ll persons within

13   [California] have the right to be free from any violence, or intimidation by threat of violence,

14   committed against their persons or property" because of race.[1]  Cal. Civ. Code §§ 51.7(a), 51(b).

15   In order to establish a section 51.7 claim, a plaintiff must show "(1) the defendant threatened or

16   committed violent acts against the plaintiff; (2) the defendant was motivated by his perception of

17   plaintiff's race; (3) the plaintiff was harmed; and (4) the defendant's conduct was a substantial

18   factor in causing the plaintiff's harm."  *Knapps v. City of Oakland*, 647 F. Supp. 2d 1129, 1167

19   (N.D. Cal. 2009) (citation omitted).  Defendants move for summary judgment on Adamson's

20   section 51.7 claim on the grounds that there is no evidence that the Defendant Officers' actions

21   were motivated by Adamson's race.

22          Adamson argues that the circumstances of his detention support the inference that his race

23   motivated the Defendant Officers' actions throughout the traffic stop, including their ensuing use

24   of force.  Viewing the evidence in the light most favorable to Adamson, the court agrees that a

25   reasonable juror could so conclude.  It is undisputed that Adamson was pulled over for a minor

26

27   [1] The Ralph Act also protects individuals based on sex, color, religion, ancestry, national origin,
     disability, medical condition, genetic information, marital status, and sexual orientation.  *See* Cal.

28   Civ. Code §§ 51.7(a), 51(b).

14

United States District Court
Northern District of California

United States District Court
Northern District of California

1    traffic violation.  It is also undisputed that Adamson was first asked whether he was on probation

2    or parole, instead of other relevant questions that do not imply past criminal behavior, and are

3    consistent with a traffic stop.  A reasonable juror could conclude that this occurred because

4    Adamson was an African American man driving in a predominantly African American

5    neighborhood. [5]  This is supported by the fact that when Adamson challenged O'Brien's decision

6    to ask him about his probationary status, O'Brien responded "that's how we do *out here*."

7    (emphasis added.)  This statement reasonably could be interpreted to mean that O'Brien's decision

8    to lead with the "probation or parole" question was motivated by the location of the traffic stop,

9    i.e., an area with a large population of African American residents.  A reasonable juror could also

10   conclude that race motivated the decision to order Adamson to exit his car after he challenged the

11   validity of O'Brien's question.  Viewing the totality of the circumstances, a reasonable juror could

12   also determine that race played a role in the officers either failing to recognize or failing to credit

13   Adamson's repeated attempts (as well as the attempts of witnesses) to alert them that he was a

14   fellow member of law enforcement, both before and after they began using force upon him, which

15   included a carotid hold.  Accordingly, the court denies summary judgment as to Adamson's

16   section 51.7 claim.

17   **E.      California Civil Code section 52.1 (Bane Act)**

18           The Defendant Officers move for summary judgment on Adamson's fourth claim for

19   violation of California Civil Code section 52.1, also known as the Bane Act.  The Bane Act gives

20   rise to a claim where "a person or persons, whether or not acting under color of law, interferes by

21   threats, intimidation, or coercion, or attempts to interfere by threats, intimidation, or coercion, with

22   the exercise or enjoyment by any individual or individuals of rights secured by the Constitution or

23   laws of the United States, or of the rights secured by the Constitution or laws of this state."  Cal.

24   Civ. Code § 52.1(a).  To prevail on a Bane Act claim, a plaintiff must demonstrate, *inter alia,*

25   "intimidation, threats or coercion."  *Jones v. Kmart Corp.*, 17 Cal. 4th 329, 334 (1998).

26

27   _____

28   [5] Although Plaintiff did not submit evidence about the racial composition of the Bayview
     neighborhood, the court takes judicial notice of the fact that African Americans are a predominant
     racial group in the neighborhood.  *See* Fed. R. Evid. 201(b), (c)(1).

United States District Court
Northern District of California

1    Adamson's Bane Act claim is based upon the Defendant Officers' alleged wrongful

2    detention and use of excessive force.  Since the court grants summary judgment on Adamson's

3    detention claim, it also grants summary judgment on the Bane Act claim to the extent it is based

4    on his detention.  *See Reynolds v. Cty. of San Diego*, 84 F.3d 1162, 1170-71 (9th Cir. 1996)

5    ("because there is no federal constitutional violation and no conduct specified which constitutes a

6    state constitutional violation, there is no conduct upon which to base a claim for liability under

7    52.1.")

8    As to the remaining Bane Act claim based on excessive force, Defendants argue that a

9    section 52.1 claim requires proof of threats, coercion, or intimidation beyond that inherent in the

10   excessive force.  Defendants cite *Allen v. City of Sacramento*, 234 Cal. App. 4th 41, 66-69 (2015),

11   in support of their position, in which the court concluded that the plaintiffs failed to state a section

12   52.1 claim based on unlawful arrest where there were no allegations of coercion beyond the

13   coercion inherent in any arrest.  As the court explicitly noted that the plaintiffs did not allege the

14   use of excessive or unreasonable force by the police, *id.* at 66, *Allen* is inapposite.  Further, this

15   court has previously held, consistent with the weight of authority in this district, that a section 52.1

16   claim "does not require threats, coercion, or intimidation independent from the threats, coercion,

17   or intimidation inherent in the alleged constitutional or statutory violation." *See Hampton v. City*

18   *of Oakland*, No. C-13-03094 DMR, 2014 WL 5600879, at \*18 (N.D. Cal. Nov. 3, 2014) (quoting

19   *D.V. v. City of Sunnyvale*, 65 F. Supp. 3d 782, 798 (N.D. Cal. 2014)).  Therefore, the court denies

20   summary judgment on Adamson's section 52.1 claim based on alleged excessive force by the

21   Defendant Officers.

22   **F.    Assault & Battery**

23   Adamson's fifth claim is for assault and battery.  The Defendant Officers move for

24   summary judgment on the grounds that their conduct was objectively reasonable for the reasons

25   described above in connection with the excessive force claim.  With respect to battery, the law

26   governing a state law battery claim is the same as that used to analyze a claim for excessive force

27   under the Fourth Amendment.  *See Sorgen v. City and Cnty. of San Francisco*, No. C 05-03172

28   TEH, 2006 WL 2583683, at \*9 (N.D. Cal. Sept. 7, 2006) (citing *Edson v. City of Anaheim*, 63 Cal.

16

1    App. 4th 1269, 1274-75 (1998)).

2          The elements of a cause of action for assault are "(1) defendant acted with intent to cause

3    harmful or offensive contact, or threatened to touch plaintiff in a harmful or offensive manner; (2)

4    plaintiff reasonably believed she was about to be touched in a harmful or offensive manner or it

5    reasonably appeared to plaintiff that defendant was about to carry out the threat; (3) plaintiff did

6    not consent to defendant's conduct; (4) plaintiff was harmed; and (5) defendant's conduct was a

7    substantial factor in causing plaintiff's harm." *Yun Hee So v. Shin*, 212 Cal. App. 4th 652, 668-69

8    (2013).

9          Given the disputes of fact regarding the reasonableness of the Defendant Officers' use of

10   force, the court denies summary judgment as to Adamson's assault and battery claims.

11   **G.      Intentional Infliction of Emotional Distress**

12         In order to establish a claim for intentional infliction of emotional distress, Adamson must

13   show "(1) extreme and outrageous conduct by [Defendants] with the intention of causing, or

14   reckless disregard of the probability of causing, emotional distress"; (2) that Adamson "suffer[ed]

15   severe or extreme emotional distress; and (3) actual and proximate causation of the emotional

16   distress by [Defendants'] outrageous conduct." *Hughes v. Pair*, 46 Cal. 4th 1035, 1050 (citations

17   and quotation marks omitted). "A defendant's conduct is 'outrageous' when it is so 'extreme as to

18   exceed all bounds of that usually tolerated in a civilized community." *Id*. at 1051 (citations and

19   quotation marks omitted). Behavior "may be considered outrageous if a defendant . . . abuses a

20   relation or position which gives him power to damage the plaintiff's interest." *Cole v. Fair Oaks*

21   *Fire Dept*., 43 Cal. 3d 148, 155 n.7 (1987).

22         The Defendant Officers argue that they are entitled to summary judgment because there is

23   no evidence that Adamson suffered extreme or severe emotional distress sufficient to maintain a

24   claim for intentional infliction of emotional distress. Under California law, "[s]evere emotional

25   distress means 'emotional distress of such substantial quality or enduring quality that no

26   reasonable [person] in civilized society should be expected to endure it.'" *Hughes v. Pair*, 46 Cal.

27   4th 1035, 1051 (2009) (quotation marks and citation omitted).

28         Adamson argues that he was "humiliated and traumatized because he yelled that he was a

United States District Court
Northern District of California

United States District Court
Northern District of California

1   police officer as he was assaulted by fellow officers." (Pl.'s Opp'n 21.) However, Adamson

2   submits no evidence to support this claim, nor does he submit any evidence about any emotional

3   distress he suffered as a result of the incident. Therefore, the court grants summary judgment on

4   Adamson's intentional infliction of emotional distress claim.

5   **H.      Negligence**

6          Defendants next move for summary judgment on Adamson's negligence claim based on

7   the use of force. In order to establish a negligence claim, Adamson must establish "(1) a legal

8   duty to use due care; (2) a breach of that duty; and (3) injury that was proximately caused by the

9   breach." *Knapps v. City of Oakland*, 647 F. Supp. 2d 1129, 1164 (N.D. Cal. 2009) (citing *Ladd v.*

10  *Cnty. of San Mateo*, 12 Cal.4th 913, 917 (1996)). Under California law, "police officers have a

11  duty not to use excessive force." *Id.* (citing *Munoz v. City of Union City*, 120 Cal. App. 4th 1077,

12  1101 (2004)). As the court denies summary judgment on the claim for excessive force, summary

13  judgment on Adamson's negligence claim is also denied.

14                                    **IV. Conclusion**

15         For the foregoing reasons, the court grants summary judgment on Adamson's unlawful

16  detention claim, Bane Act claim based on unlawful detention, and due process, unlawful seizure,

17  and excessive force claims based on the Fourteenth Amendment.

18

19         **IT IS SO ORDERED.**

20  Dated: September 17, 2015

21  _____

22  Donna M. Ryu
    United States Magistrate Judge

23



24

25

26

27

28

18